# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMINA FAROOQ,<br>Personal Representative of the Estate<br>of NADIR FAROOQ, Deceased,<br><br>    Plaintiff,<br><br>    v.<br><br>MDRB CORPORATION<br>D/B/A RAMADA INN HOTEL, et al.,<br><br>    Defendants. | Civil Action No. 1:06-cv-00211-RMC |

## CERTIFICATION OF STANLEY TRAVERS

I, Stanley Travers, certify the following as true and correct:

1.  I am over eighteen years of age, am competent to make this affidavit, am authorized to do so, and have knowledge of the statements made herein.

2.  I was the Assistant General Manager of MDRB Corporation ("MDRB") from July 1998 through April 2004.

3.  During that time, MDRB owned and operated a hotel located at 1600 New York Avenue, N.E., Washington, DC and known during that time as the "Ramada Limited" (the "Hotel"). The Hotel contained several conference rooms and a part of the Hotel's business was the rental of these rooms to third parties for special events. The conference rooms were rented for various purposes, including mainly wedding receptions, company dinners, private parties, and church services. MDRB rented these conference rooms many hundreds of times during the period it owned and operated the Hotel.

4. On or about September 16, 2002, the John Doe Defendants—identified as "Ben & Reggie" and otherwise unknown to MDRB—leased from MDRB a meeting room in the Hotel for what they described to MDRB as a "Private Party" to be held on the evening of September 27, 2002.

5. On September 27, 2002, and in the meeting room they had leased from MDRB, the John Doe Defendants hosted a paid-admission event at the Hotel and hired—according to Plaintiff Amina Farooq—a to-date unidentified group, referred to in Plaintiff's Complaint (at ¶ 6) as Defendant "Richard Roe Security Company," to provide security services for the event. MDRB was unaware that any security company had been employed for what had been represented as a "Private Party."

6. MDRB was unaware at the time of negotiating the lease or at any time before the actual event that the John Doe Defendants intended to host a paid-admission event through their lease of that meeting room.

7. MDRB had on several earlier occasions rented its meeting room for paid-admission events at which security personnel, supplied by the leasor, were stationed at the door of meeting room for the purpose of controlling ingress (a) so that only people who had paid the admission charge gained entry and (b) so that those admittees were not carrying items not permitted by the leasor, particularly including beverages which would "compete" with the beverages the leasor was offering to sell inside the gathering room.

8. On the evening in question, I—who had worked with "Ben and Reggie" at the time they rented the meeting room (and who was then told by them that they themselves would set up chairs and tables in the room, which was not uncommon for leasors to do)—was stationed in the Hotel's parking lot opposite from the Hotel's main entrance. My task at that point was to

monitor the use of the parking lot, restricting it to overnight guests, until such time as the several tour buses MDRB was expecting had arrived back at the Hotel for the evening. I performed this function from about 6:30 p.m. until between 10:00 and 11:00 p.m.

9. Early on during that period—i.e., between 6:30 and 7:00 p.m.—I saw the "Ben and Reggie" group arriving to set up the room for their event. That group brought in musical equipment and containers of soda pop, the latter ostensibly to be provided and/or sold to the people attending their event.

10. As early as about 8:00 p.m., and although I was on the side of the building opposite from the Hotel's main entrance, I saw young people whom I believed were beginning to arrive for that event.

11. Not until after my watch in the parking lot—i.e., sometime between 10:00 and 11:00 p.m.—did I first see that people wearing "SECURITY" tee shirts were attending the door to the rented meeting room. To my knowledge, I was the first MDRB employee to have seen those "SECURITY" personnel. However, I did not see or hear of the "SECURITY" personnel taking any weapons of any sort from anyone, although I could observe that their screening process would likely have prevented anyone from bringing in any bottled or canned beverages or the like.

12. I did not know of any specific criminal risk to Nadir Farooq nor of any general criminal risk to him or the other attendees of "Ben and Reggie's" event that evening.

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 21, 2007.

*Stanley A. Travers*
Stanley Travers