# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MARK PRINCE EDWARDS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-547 (RMC)** |
| | ) | |
| **OKIE DOKIE, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This lawsuit arises from an altercation outside the Dream Nightclub after Plaintiffs Mark Prince Edwards, Onoriode Egbeju, and Anita M. Mungal were denied admission. Plaintiffs brought suit for violations of the Fourth, Fifth, and Fourteenth Amendments under 42 U.S.C. § 1983 and for numerous torts, all essentially alleging excessive use of force and false arrest. The Amended Complaint names the following defendants: the District of Columbia, Mayor Anthony Williams, Police Chief Charles Ramsey, and D.C. Police Officer Charles Whiteside (collectively, the "D.C. Defendants") as well as Okie Dokie, Inc., the owner and operator of the Dream Nightclub. Okie Dokie and the D.C. Defendants have filed motions for summary judgment.

Plaintiffs oppose Okie Dokie's motion and seek summary judgment in their favor, but their arguments are without merit. Since Plaintiffs do not allege that Okie Dokie was acting under color of state law or pursuant to any government custom or policy, their section 1983 claims against it must fail. Further, Plaintiffs' common law tort claims cannot go forward because Plaintiffs have failed to name an expert to establish the applicable standard of care and because there was probable cause to arrest Messrs. Edwards and Egbeju. Plaintiffs filed no opposition to the motion

filed by the D.C. Defendants, and thus it is conceded.[1]  Even if they had responded, the Court has

determined as a matter of law that Plaintiffs' claims are infirm and must be dismissed.  Okie Dokie

and the D.C. Defendants' motions for summary judgment will be granted, and Plaintiffs' motion for

summary judgment will be denied.

## I. BACKGROUND FACTS

The underlying facts are gleaned from those portions of the trial transcript of Messrs.

Edwards and Egbeju's criminal trial that the Plaintiffs have submitted with their cross motion for

summary judgment,[2] *see United States v. Edwards*, M50-04 & M40-04 (D.C. Sup. Ct.), Trial Tr.

Mar. 15, 2004 (filed here as Dkt. # 21, attachments 1 & 2 and Dkt. # 22) (hereinafter cited as "Tr."),

together with the allegations set forth in the Amended Complaint.

Messrs. Edwards and Egbeju and Ms. Mungal approached the Dream Nightclub at

1350 Okie Street, N.E., Washington, D.C., at about 12:45 a.m. on January 2, 2004.  Am. Compl.

¶ 12.  Mr. Edwards presented a discount voucher for entry without payment of a cover charge.  *Id.*

¶ 14.  The security officer at the door of the Nightclub refused to honor the voucher, *id.* ¶ 15, and the

General Manager of the Dream Nightclub, Makan Shirafkn, was called over.  Tr. at 12.  Mr. Shirafkn

informed Mr. Edwards that the voucher was not authorized by the Nightclub and that he would have

---

[1] Although represented by counsel, Plaintiffs failed to respond to the motion for summary judgment filed by the D.C. Defendants in accordance with the Court's Scheduling Order. *See* Dkt. #8.  When confronted with a failure to respond, the Court may treat the motion for summary judgment as conceded. *Fed. Deposit Ins. Corp. v. Bender*, 127 F.3d 58, 68 (D.C. Cir. 1997); *Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002).

[2] "It is the Plaintiffs [sic] position that there are no factual questions, the evidence presented is the prior sworn testimony of the supervisory employees of the Defendant Okie Dokie." Pls.' Mem. in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Cross Mot. for Summ. J. ("Pls.' Mem.") at 7.  Plaintiffs did not file a complete copy of the trial transcript.

to pay five dollars to enter. *Id.* at 12-13. In response, Mr. Edwards "start[ed] getting loud and just, you know, the conversation start[ed] getting louder and louder and he said that's not happening." *Id.* at 13. To avoid a problem in front of other customers, Mr. Shirafkn asked the group to step outside where they could talk. *Id.*

Outside the Nightclub, Mr. Edwards stepped to the far side of the rope barrier that the Nightclub uses to line up patrons waiting for entry. *Id.* at 15. He continued to complain about the failure to honor his voucher. Mr. Shirafkn testified:

> Then the discussion further went on saying, you know, why is this happening, why can't I get in. I said you know what, at this point I don't feel safe having you in the club. We're just not going to let you in. He said I'm going to sue you for this, this pass is no good. I'm going to sue you. I said you can do what you want to do if that's the case that's fine. But based on the behavior that I [saw] at the front door, based on the altercation you've already had with our security and the temper that you have, I don't feel safe allowing you to go in there dealing with people who are drinking inside. They might say something less [sic] to you and it might upset you. He said I'm standing for my rights. I remember specifically, he said I'm standing for my rights, why is that a problem. I said that's not a problem, but my problem is if for $5 there's going to be such issues that you're going to get upset, you're going to curse out the security and other customers, our water inside is $5, my cheapest shot is $5. I'm sure I don't want to take that risk of having you go inside putting my security, yourself, and other customers in danger, so we're not doing it.

*Id.* at 15-16.

Mr. Shirafkn then turned away to tend to other customers. *Id.* at 17. Messrs. Edwards and Egbeju and Ms. Mungal approached Mr. Shirafkn and demanded to speak to David Rafee, who they believed was the Nightclub's General Manager. *Id.* at 18. They refused to credit Mr. Shirafkn's statements that he was the General Manager. *Id.* Mr. Shirafkn attempted to reach Mr. Rafee by radio "because I want[ed] him to come and let them know who I am and what I do." *Id.* There was no response to Mr. Shirafkn's radio call, and Mr. Edwards told him to "stop faking" because Mr.

Edwards did not believe any call had been made. *Id.* At that point, Mr. Shirafkn said, "[T]hat's it, I'm not dealing with this anymore. I can't do anything, I'm sorry." *Id.* Ms. Mungal asserted that she is a lawyer and would sue. *Id.* At that point, Mr. Shirafkn replied, "[I]f I don't feel safe with you being in the club, you're not coming in the club. That's just the bottom line," and he walked away. *Id.* at 18-19.

Mr. Shirafkn then stopped to talk with another patron in line; the patrons stood on one side of a railing-type barrier and Mr. Shirafkn stood on the club side of the railing. *Id.* at 20. Mr. Edwards came from behind the other patron, reached over his shoulder, and punched Mr. Shirafkn in the side of his head. *Id.* at 20-21. The energy behind the punch was sufficient to carry Mr. Edwards forward and right over the railing, where he and Mr. Shirafkn landed on the ground. *Id.* at 21.[3]

Two or three security personnel, together with Mr. Shirafkn, immediately put Mr. Edwards in a "lock-down, just grabbed his hands because he was trying to fight." *Id.* at 22. Ms. Mungal "also started with security, so security had to put her down by the car [sic] just having her held tight" until the police arrived. *Id.* at 24.

The trial record is unclear whether Mr. Egbeju attempted to separate the two men or joined in the melee in support of Mr. Edwards. Mr. Egbeju had started to walk away but, on hearing the commotion, turned around and came back to where Mr. Edwards and Mr. Shirafkn were on the

---

[3] The Court notes that it is reciting events as described in the testimony in Superior Court and as offered by the Plaintiffs in support of their cross motion for summary judgment. There is nothing in the record to support the description by Plaintiffs' counsel that Mr. Shirafkn spoke in a "most belligerent tone" to tell Mr. Edwards that his patronage was unwanted or that "Mr. Shirifkhan [sic] struck Plaintiff Edwards in the face with his hand held walkie talkie and caused Mr. Edwards to fall to the ground." Pls.' Mem. at 4.

ground. Pls.' Mem. at 4. Mathey Rofougaran, a witness to the incident, testified that Mr. Egbeju had tried to break up the fight between Mr. Edwards and Mr. Shirafkn, *see* Tr. at 115, until Mr. Egbeju got involved. *Id*. at 116. "Then once he got involved, they were throwing punches, so when your trying to break up a fight you don't throw punches . . . . You hold people." *Id*. Mr. Rofougaran stated, "Initially he [Mr. Egbeju] had gone up and tried to hold, pull Makan off or pull somebody off. I'm not sure who. Pull somebody off and then within seconds punches were thrown [by someone]." *Id*. at 123. "I know there [were] punches thrown, but I don't know exactly who he hit or what he exactly did." *Id*. Mr. Shirafkn testified that Mr. Egbeju shoved him in the back for two seconds before Mr. Egbeju too was "put down" by security. *Id*. at 24.

Police were called and officers of the D.C. Metropolitan Police Department ("MPD") responded, including Defendant Officer Whiteside. The police observed Messrs. Edwards and Egbeju "being restrained by club security." D.C. Defendants' Mem. in Supp. of Mot. for Summ. J. ("D.C.'s Mem.") Ex. 1, Statement of Probable Cause. After hearing of the events described above from five witnesses,[4] the officers arrested Messrs. Edwards and Egbeju for simple assault and

---

[4] The police report stated:

> W-1 [Witness-1], who is employed by the nightclub, reported that the Def. (Edwards) approached W-1 and attempted to enter with a pass which the Def. (Edwards) believed would have exempted him from having to pay an admission charge. W-1 told the Def. (Edwards) that he would still have to pay a $5.00 cover charge and the Def. (Edwards) refused and became loud and boisterous at the security entrance and refused to leave.

> The Def. (Edwards) then got on his cell phone and began to talk loudly about suing the club. W-1 then began to speak to W-3 when the Def. (Edwards) struck W-1 in the face with his closed fist. W-1 fell to the ground with the Def. (Edwards) and then the Def. (Egbeju) approached and began to strike W-1 in his back with fists. Additional club security arrived and attempted to break up the parties but the Defs. (Edwards) and Egbeju)

transported them to the police station for processing. *Id.*; *see also id.* Ex. 3, Information filed against Mr. Egbeju.

At a joint bench trial before Judge Zinora Mitchell-Rankin in D.C. Superior Court, Mr. Edwards was found guilty of assault and sentenced to 60 days in jail, *see id.* Ex. 2, Judgment and Commitment Order, and Mr. Egbeju was found not guilty. *Id.* Ex. 4, Final Disposition.

As a result of the above described events, Plaintiffs brought a ten-count Amended Complaint alleging one federal cause of action and nine common law causes of action as follows:

> Count I  –  Violation of 42 U.S.C. § 1983 based on the Fourth Amendment right to be free from unreasonable search and seizure (excessive force) and based on the Fifth and Fourteenth Amendment right to be free from deprivation of liberty without due process;
>
> Count II – False Arrest;
>
> Count III – False Imprisonment;
>
> Count IV – Intentional Infliction of Emotional Distress;
>
> Count V – Assault;
>
> Count VI – Battery;
>
> Count VII – Gross Negligence;
>
> Count VIII – Negligent Infliction of Emotional Distress;
>
> Count IX – Negligent Hiring and Supervision; and

---

> continued to punch and kick at security. . . . W-3 through W-5 corroborated W-1's and W-2's accounts of the incident.

D.C.'s Mem. Ex. 1, Statement of Probable Cause.

Count X[5] – Malicious Prosecution.

Plaintiffs seek compensatory damages, punitive damages, and attorney fees under 42 U.S.C. § 1988.[6]

Am. Compl. ¶ 38, 40, 42, 45, 48, 51, 53, 55, 57, 62.

## II. LEGAL STANDARDS

A. Jurisdiction

Federal district courts have original jurisdiction over civil actions arising under federal statutes. 28 U.S.C. § 1331. Here, Plaintiffs brought suit under 42 U.S.C. § 1983. As this case presents a question of federal law, this Court has original jurisdiction. The Court has supplemental jurisdiction over the common law claims. 28 U.S.C. § 1367.

B. Choice of Law

Where supplemental jurisdiction is exercised, federal courts apply the forum state's choice of law rules. *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995). The District of Columbia applies the substantial interest test, focusing on the place of the injury, the place were the injurious conduct occurred, the residency of the parties, and the place the parties' relationship is centered. *Jaffe v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir.

---

[5] Plaintiffs mistakenly labeled the malicious prosecution count as "Count Nine" when it is the tenth cause of action listed in the Amended Complaint. Am. Compl. ¶¶ 58-62.

[6] Plaintiffs may not recover punitive damages against the District of Columbia. Punitive damages are not available against a municipality absent an express statutory provision. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981); *Smith v. Dist. of Columbia*, 399 A.2d 213, 218 (D.C. 1979); *see Feirson v. Dist. of Columbia*, 315 F. Supp. 2d 52, 57 (D.D.C. 2004) (punitive damages are not available against D.C. on a § 1983 claim). Plaintiffs also seek "[d]eclaratory and injunctive relief prohibiting Defendants from engaging in further federal civil rights violation [sic]." Am. Compl. ¶ 38(a). Because Plaintiffs only complain about alleged civil rights violations that occurred in the past and do not allege any ongoing violations, their request for declaratory and injunctive relief is moot.

2004). In this case, the District of Columbia is where the alleged injury occurred, where the alleged injurious conduct occurred, and where the parties' relationship was centered. Thus, D.C. substantive law applies to the common law claims.

### C. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Id.*; *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on

-8-

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.*

## III. ANALYSIS

Officer Whiteside and fellow officers responded to a call that there was an altercation at the Dream Nightclub on January 2, 2004. When they arrived, they observed Messrs. Edwards and Egbeju being restrained by club security. They interviewed witnesses and concluded that probable cause existed to arrest the two men for assault. Ms. Mungal was not arrested and was not charged with any criminal behavior. Upon trial, Mr. Edwards was convicted and Mr. Egbeju was found not guilty. On these straightforward facts, Plaintiffs sue the D.C. Defendants. The Plaintiffs seek damages from Okie Dokie and the D.C. Defendants based on the alleged violation of Plaintiffs' constitutional rights and a host of common law torts. Each of the claims will be examined in turn.

### A. Section 1983 Claim

#### 1. Section 1983 Claim Against D.C. Officials in Their Official Capacity

The Amended Complaint names Mayor Anthony Williams and Police Chief Charles Ramsey in their official capacities. A section 1983 suit against an official in his official capacity is not a suit against the official, but a suit against the official's office, *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), and a plaintiff's claims against a defendant in his official capacity are treated as claims against the municipality, *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985);

-9-

*Atchison v. Dist. of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996). Here, the Court will treat the suit

against Mayor Williams and Police Chief Ramsey as a suit against the District of Columbia and will

dismiss  Mayor Williams and Police Chief Ramsey from this suit.  *See, e.g., Busby v. City of*

*Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (officials sued in their official capacity were dismissed

from a suit against the municipality).[7]

      2.  Section 1983 Claim Requires Action Under Color of State or D.C. Law

      To prevail in a civil rights action under 42 U.S.C. § 1983, a plaintiff must plead and

prove that the defendants, acting under color of state or D.C. law,[8] deprived the plaintiff of a right

secured by the Constitution and laws of the United States.  *West v. Atkins*, 487 U.S. 42, 48 (1988);

*Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474

---

[7] Even if Plaintiffs had named Mayor Williams and Chief Ramsey individually, the section 1983 claim against them would have failed because (1) there are no allegations that they were personally involved in the alleged violation of Plaintiffs' constitutional rights and (2) they cannot be held liable under section 1983 for the actions of their subordinates on the basis of respondeat superior. *Monell v. Department of Social Servs.*, 436 U.S. 658, 694 (1978); *Morgan v. District of Columbia*, 550 F. Supp. 465, 468 (D.D.C. 1982), *aff'd without op.*, 725 F.2d 125 (D.C. Cir. 1983) (Table). A supervisor can be held liable for a constitutional violation only if a plaintiff can demonstrate: (1) a grave risk of harm; (2) the supervisor's actual or constructive knowledge of that risk; and (3) the supervisor's failure to take available measures to address the risk. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). Plaintiffs have not so alleged.

[8] Section 1983 states, in relevant part:

> Every person who, under color or any statue, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at  law, suit in equity, or other proceeding for redress.

42 U.S.C. § 1983.

U.S. 327 (1986); *see Johnson v. Miller*, 680 F.2d 39, 40 (7th Cir. 1982) (finding that a plaintiff does not have a section 1983 claim against a private citizen who files a criminal complaint leading to the arrest of plaintiff). A person may be considered a state actor for purposes of section 1983 if he is a "willful participant in joint activity with the State or its agents," *Williams v. U.S.*, 396 F.3d 412, 414 (D.C. Cir. 2005), if there is "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself," *id.*, or where there is a transfer of State authority, *Int'l Action Ctr. v. United States*, No. 01-72, 2002 U.S. Dist. LEXIS 4614, at *5-6 (D.D.C. March 14, 2002), *rev'd in part on other grounds*, 365 F.3d 20 (D.C. Cir. 2004).

        The Amended Complaint does not allege that Okie Dokie was acting under color of D.C. law. In fact, Plaintiffs concede that Messrs. Egbeju and Edwards were arrested by MPD officers, not Okie Dokie. Am. Compl. ¶ 26. Nonetheless, Plaintiffs' counsel argues that "the behavior of [Okie Dokie] in placing Plaintiffs under arrest, holding them on the ground against their will, binding up their hands and feet behind them while maintaining them on the ground for some time until the arrival of the police . . . constituted the act of willfully or voluntarily assuming the color of state law and acting like agents of the District of Columbia." Pls.' Mem. at 8. These arguments are an inadequate substitute for the evidence necessary to establish liability under § 1983. It is not enough to oppose summary judgment by simply stating that Okie Dokie was acting under color of D.C. law. Plaintiffs must present some evidence to support their statements. *See Celotex*, 477 U.S. at 322 (by pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment); *Greene*, 164 F.3d at 675 (nonmoving party must present specific facts that would enable a reasonable jury to find in its favor).

        Nothing in the trial transcripts presented by Plaintiffs suggests that the District of

Columbia ceded any of its authority to the security personnel at the Dream Nightclub. The mere fact that security "took down" the Plaintiffs does not constitute willful participation in the law enforcement activity of the District of Columbia. Because Plaintiffs have failed to present evidence that Okie Dokie was a state actor, the § 1983 claim against Okie Dokie must be dismissed.

_____3.  Qualified Immunity

The doctrine of qualified immunity requires dismissal of the section 1983 claim against Officer Whiteside. Qualified immunity shields a government official from liability under section 1983 provided that the official's conduct did not violate a clearly established constitutional right of which a reasonable person would have known. *Wilson v. Layne*, 526 U.S. 601, 609 (1999). To determine whether qualified immunity applies, courts make a two-fold inquiry. First, the court must determine whether the plaintiff's allegations, taken as true, show that the officer's conduct violated a constitutional or statutory right. *Saucier v. Katz*, 533 U.S. 194, 201 (1999); *Int'l Action Ctr. v. United States*, 365 F.3d 20, 24 (D.C. Cir. 2004). If the plaintiff's allegations show a constitutional violation, the court must then examine whether the constitutional right in question was clearly established, in the view of a reasonable officer, at the time of the alleged violation. *Id.* Plaintiffs allege that Officer Whiteside violated their Fourth Amendment right to be free of unreasonable seizure and their Fifth and Fourteenth Amendment due process rights.[9] As explained below, Plaintiffs have failed to present any evidence showing that Officer Whiteside violated such rights.

---

[9] Although Ms. Mungal is named as a plaintiff in all Counts of the Amended Complaint, she has not stated a section 1983 claim against the D.C. Defendants. While the arrest of Messrs. Edwards and Egbeju serves as the basis for their constitutional claims, Ms. Mungal was not arrested or charged with any misconduct; she has not alleged any facts to support a claim that the D.C. Defendants violated her constitutional rights.

<u>a. Alleged Fourth Amendment Violation – Arrest Without Probable Cause</u>

It is well established that an arrest without probable cause violates the Fourth Amendment, *Martin v. Malhoyt*, 830 F.2d 237, 262 (D.C. Cir. 1987) (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)), and that probable cause is determined by the totality of circumstances, *Illinois v. Gates*, 462 U.S. 213, 230 (1983). An officer has probable cause to arrest if he has reasonably trustworthy information that would be sufficient to warrant a prudent person to believe the arrestee committed or was committing an offense. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). In a section 1983 suit such as this one, a court must determine whether qualified immunity applies — that is, whether a reasonable officer could have believed that the plaintiff's arrest was lawful, in light of clearly established law and the information possessed by the arresting officer. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). For example, police may rely on an informant's tip to establish probable cause provided that the information is reliable and the informant is trustworthy. *Aguilar v. Texas*, 378 U.S. 108, 114-15 (1964); *see also Robinson v. Dist. of Columbia*, No. 03-1455, 2006 WL 2714913, at *4 (D.D.C. Sept. 22, 2006) (noting that officers had probable cause to arrest a suspect for theft when he was identified by a witness as the person seen with a crowbar looking into cars and the officers saw a number of purses in the car with the suspect).

Even with the limited record presented by the Plaintiffs, it is clear that Officer Whiteside had probable cause to arrest Messrs. Edwards and Egbeju. The police arrived at the Nightclub and saw Messrs. Edwards and Egbeju being restrained by club security. D.C.'s Ex. 1, Statement of Probable Cause. After hearing about the altercation from five witnesses, the officers arrested Messrs. Edwards and Egbeju for simple assault. *Id.* Officer Whiteside had reasonably

-13-

trustworthy information based on witness testimony that was sufficient to warrant him in believing that Messrs. Edwards and Egbeju had assaulted Mr. Shirafkn. Probable cause was established unquestionably with regard to Mr. Edwards, since after a trial in D.C. Superior Court, Mr. Edwards was found guilty of assault and sentenced to 60 days in jail. *See* D.C.'s Mem. Ex. 2, Judgment and Commitment Order. Even though Mr. Egbeju was found not guilty of assault, this does not undermine Officer Whiteside's finding of probable cause to arrest. The MPD gathered the testimony of five witnesses. Based on this information, a reasonable officer would have believed that he had probable cause to arrest Mr. Egbeju.

### b.  Alleged Fourth Amendment Violation – Excessive Force

The Amended Complaint purports to assert an excessive force claim against all of the named defendants, but it does not contain any factual allegations that would support such a claim against the D.C. Defendants. The Amended Complaint alleges that Okie Dokie's employees used excessive force to restrain Plaintiffs while waiting for the police to arrive, as follows:

> 22. Plaintiff Edwards was restrained and severely beaten about the head and body by the Defendant Bouncers for some five to ten minutes. Plaintiff Mungal was assaulted, her spaghetti strap dress ripped off exposing her bare breasts and battered severely by defendant's employees for some time. Plaintiff Egbeju was also stomped by the Defendant Bouncers for some five minutes as well.

> . . . .

> 25. Paramedics were called and reported to the scene and offered treatment to Plaintiff Edwards and his party, however the police refused to give custody over to the medical staff . . . .

> 26. Plaintiffs Egbeju and Edwards were then falsely arrested by members of [sic] metropolitan police department.

Am. Compl. ¶¶ 22, 25, 26. Nowhere does the Amended Complaint allege that the D.C. Defendants

used excessive force in arresting Messrs. Edwards and Egbeju.[10]

### c.  Alleged Due Process Violation

Plaintiffs have alleged a violation of procedural due process — that the Defendants violated Plaintiffs' "Fifth and Fourteenth Amendment rights to due process of law, including the right to be free from deprivation of liberty without due process of law."[11]  Am. Compl. ¶ 38.  Where the state provides adequate post-deprivation remedies such as those available in a tort action, the right to procedural due process is not violated.  *Crawford v. Parron*, 709 F. Supp. 234, 236-37 (D.D.C. 1986) (citing *Parratt*, 451 U.S. 527, and *Hudson v. Palmer*, 468 U.S. 517 (1984)).  "[W]here a plaintiff challenges random, unauthorized governmental conduct on the ground that it deprived him or her of liberty *without due process*, the consensus of the circuits is that such procedural due process cases are governed by *Parratt*, and that no cognizable constitutional claim can be stated where adequate post-deprivation state remedies are available."  *Crawford*, 709 F. Supp. at 240.  Plaintiffs' due process claim is not cognizable because there are adequate post-deprivation remedies, as evidenced by the various tort claims asserted here.

---

[10] An excessive force claim is evaluated under an objective reasonableness standard, *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004), taking into account the circumstances of the case, including whether the suspect posed an immediate threat to safety and whether he was actively resisting arrest.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The police have the right to use some degree of physical coercion or threat thereof in making an arrest, and "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (citation omitted).

[11] The due process clause of the Fifth Amendment applies to the District of Columbia.  The District of Columbia is a political entity created by the federal government, and thus it is subject to the restrictions of the Fifth Amendment, not the Fourteenth.  *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1330 n.5 (D.C. Cir. 1991) (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).  "The procedural due process components of the two Amendments are the same."  *Id.* at 1330 n.5.

-15-

In sum, even if Plaintiffs' allegations are taken as true, Plaintiffs have not presented any evidence that conduct of any D.C. Defendant violated Plaintiffs' constitutional rights. *Saucier*, 533 U.S. at 201-02. Because there is no evidence of a constitutional violation, the section 1983 claim against Officer Whiteside will be dismissed.

### 4. Municipal Liability under *Monell*

In order to state a claim against a municipality under section 1983, a plaintiff must show that the municipality, through an official custom, practice, or policy, caused the alleged constitutional violation. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). As discussed above, Plaintiffs have not presented any evidence showing that their constitutional rights were violated. Because there is no evidence of a constitutional violation that was caused by a D.C. custom, practice, or policy, the District of Columbia cannot be liable under section 1983.

### B.  False Arrest/False Imprisonment

The elements of the tort of false arrest and false imprisonment are: (1) the detention or restraint of one against his will within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint. *Koroma v. United States*, 628 F. Supp. 949, 952 (D.D.C. 1986). The focal point for these kinds of claims is normally whether the arresting officer was justified in arresting a plaintiff. *Id.* "Liability is incurred for the procuring of a false arrest and imprisonment if by acts or words, one directs, requests, invites or encourages the unlawful detention of another." *Smith v. Dist. of Columbia*, 399 A.2d 213, 218 (D.C. 1979). "Justification can be established by showing that the arresting officer had probable cause for arrest of the plaintiff on the grounds charged or that he had a reasonable basis to believe that a crime had been committed and the officer acted in good faith in

-16-

making the arrest." *Koroma*, 628 F. Supp. at 952.

Plaintiffs assert that they are entitled to summary judgment on this claim because Mr. Shirafkn admitted that Okie Dokie security personnel "put the Plaintiffs down" and held them until the police came. Pls.' Mem. at 9-10. Further, there was testimony that Okie Dokie employees "spoke to the police upon arrival and handed over the plaintiffs." *Id.* at 12. Plaintiffs miss a critical concept in their argument — a cause of action for false arrest or for false imprisonment depends upon an "unlawful detention." *Smith*, 399 A.2d at 218. Plaintiffs concentrate their argument on the fact that security personnel wrestled them to the ground, completely failing to note anywhere in their argument that Mr. Edwards' closed-fist blow to Mr. Shirafkn's head started the melee. There is no reasonable doubt about Mr. Edwards' actions — he was found guilty of misdemeanor assault after a trial in Superior Court.

Late-night patrons at a nightclub might be prone to unruly behavior; that is why nightclubs have security personnel. When it appears that two men have attacked one, security personnel step in as promptly as possible to put an end to it. Whether the specific actions by these security personnel were reasonable under the circumstances, *i.e.*, whether they used excessive force, is not the issue with regard to Plaintiffs' false arrest/false imprisonment claim. The question is whether the Nightclub security acted lawfully when they detained the Plaintiffs and reported on their actions to the MPD. The answer to that question is inevitably "yes." Multiple witnesses told the police about the Plaintiffs' disruptive actions outside the Nightclub. Okie Dokie security personnel lawfully restrained Plaintiffs, and Officer Whiteside had probable cause to arrest Messrs. Edwards and Egbeju. Given the facts in the record, there was no "unlawful detention" and thus no false arrest.

-17-

C.  Assault, Battery, and Various Negligence Claims

        Plaintiffs seek damages for assault (Count V), Battery (Count VI), Gross Negligence (Count VII), Negligent Infliction of Emotional Distress (Count VIII), and Negligent Hiring and Supervision (Count IX).  They cannot satisfy their burden of proof on these claims because they have failed to designate an expert to testify to the standard of care required for security personnel and police under these circumstances.

        Under D.C. law, expert testimony is required to prove deviation from the applicable standard of care in a negligence action.  The plaintiff in a negligence action bears the burden of proof on three issues: the applicable standard of care; a deviation from that standard; and a causal connection between such deviation and the injury.  *Hill v. Metropolitan African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001).  The jury may evaluate the facts without the aid of expert testimony only if the ultimate issue is within their common knowledge and everyday experience.  *Dist. of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C. 1984).  Where "the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson," the plaintiff must present expert testimony to establish the standard of care.  *Hill*, 779 A.2d at 908.

        Thus, D.C. district and local courts have held that expert testimony is required to establish the standard of care for a claim of negligent hiring, training, and supervision of security personnel.  *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 89 (D.D.C. 2000) (negligent supervision); Okie Dokie's Mem. in Supp. of Mot. for Summ. J. ("Okie Dokie's Mem.") Ex. 4, *Predzin v. DC Arena Limited P'ship*, No. 02-9582, at *5 (D.C. Sup. Ct. Oct. 7, 2003) (negligent

-18-

hiring, training, and supervision). Similarly, expert testimony is needed to prove a claim for negligent infliction of emotional distress. *Fletcher v. Dist. of Columbia*, No. 01-0297, 2005 U.S. Dist. LEXIS 5013, *23 (D.D.C. Mar. 22, 2005). In *Fletcher*, the plaintiff sued D.C. police officers who shot plaintiff as he left the scene of a liquor store he had robbed. *Id*. at *4. The court found that the plaintiff was required to name an expert to testify that the officers had deviated from the proper standard of care in using their firearms. *Id*. at *23-24. Expert testimony also is necessary to prove a claim for assault and battery when the plaintiff alleges that security guards failed to prevent an assault and battery by a third party. *Predzin,* at *6 (noting that "technical knowledge of the security business and . . . a familiarity with the exercise of professional judgment by trained security officials" are outside the "everyday experiences and understanding of average lay people," so that expert testimony was needed to evaluate what security personnel should have done to protect plaintiff from an assault and battery). *See Hill*, 779 A.2d at 910 (finding expert testimony necessary regarding standard of care in crowd control and management). When expert testimony is necessary to establish the standard of care, a plaintiff's failure to name an expert constitutes grounds for dismissal. *Fletcher*, 2005 U.S. Dist. LEXIS 5013, at *23-24 (granting summary judgment on claim of negligent infliction of emotional distress when plaintiff failed to designate an expert to establish the standard of care).

Plaintiffs argue that no expert witness is necessary.

> It is Plaintiffs [sic] position that even without an expert, under the doctrine of res ipsa loquitur, members of the public know patrons of a nightclub must necessarily be beaten to a pulp to maintain control over the crow[d] at a

-19-

> club.[12] Second, such knowledge is not beyond the ken of the
> jury to know the norms of club management and bouncers.
> Additionally in light of Defendants [sic] admissions, it is
> Plaintiffs' position that a security expert is not necessary.

Pls.' Mem. at 7-8. In other words, Plaintiffs contend that the standard of care for security at a night club, and for the police who respond to an altercation at a night club, is within the common knowledge and everyday experience of lay people. This is simply not the case. The Dream Nightclub is a large and complicated operation. It is made up of four floors, four decks, VIP rooms, and a Penthouse Suite. *See* Okie Dokie's Mem. Ex. 1, Affidavit of Marc Barnes ¶ 2. Dream may host 3,000 to 5,000 guests throughout a single night. *Id.* ¶ 3; Tr. at 16. On the evening of January 1, 2004, the Nightclub had a heavy crowd, Tr. at 16, and 400-500 people were in line in front of the club. *Id.* at 25. Plaintiffs tried to gain entry into the Nightclub at peak time. *Id.* Under such circumstances, expert testimony would be necessary to determine whether the security personnel acted reasonably when they (1) "put down" Mr. Edwards after he landed a punch on the General Manager's head; (2) "put down" Ms. Mungal after she separately engaged security; and (3) "put down" Mr. Egbeju when he came over and apparently joined the tussle between Mr. Edwards and Mr. Shirafkn. Plaintiffs' belief that a jury would know the "norms of club management and bouncers" is unsupported and contrary to the decisions of local courts. Without an expert to testify to the standard of care and the reasonableness or unreasonableness of the actions of security personnel and the police at the Dream Nightclub on the night in question, Plaintiffs cannot sustain their burden of proof.

---

[12] The Court reads this statement as a sarcastic commentary on events.

D.  Intentional Infliction of Emotional Distress

Like the claims for assault, battery, and negligence, an intentional infliction of emotional distress claim requires expert testimony.  To establish a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of a defendant that (2) intentionally (3) caused the plaintiff to suffer severe emotional distress.  *Smith*, 882 A.2d at 794.  The conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized society.  *Id.* Plaintiffs cannot establish that the conduct of Okie Dokie or the D.C. Defendants was outrageous under the circumstances without expert testimony to establish the appropriate standard of care.  As explained above, legal liability must be premised on a failure to conform to the appropriate standard of care, which can vary from job to job and circumstance to circumstance.  Because Plaintiffs have failed to name an expert to support their claim for intentional infliction of emotional distress, the claim will be dismissed.

E.  Malicious Prosecution

Plaintiffs also advance a claim of malicious prosecution.  The Amended Complaint does not assert this claim against Okie Dokie.  The Amended Complaint alleges that "[the Defendant officers of the [MPD] initiated the arrest and criminal charges against the Plaintiff[s]," Am. Compl. ¶ 59, and that the criminal proceeding was initiated without probable cause, on the basis of false and misleading information, and with malice and "a purpose other than bringing Plaintiff[s] to justice, namely in order to discourage the Plaintiff[s] from filing complaint [sic] with [MPD], cover-up [sic] their use of excessive force against the Plaintiff[s] and discourage Plaintiff[s'] pursuit of civil suit

-21-

for violation of civil rights." Am. Compl. ¶ 60-61.  Nowhere does the Amended Complaint allege that Okie Dokie had responsibility or liability for the prosecution of Defendants Edwards and Egbeju for misdemeanor assault.  Accordingly, the malicious prosecution claim against Okie Dokie must be dismissed.

The malicious prosecution claim against the D.C. Defendants will also be dismissed. Malicious prosecution requires: (1) the initiation or procurement of criminal proceedings; (2) without probable cause; (3) primarily for a purpose other than bringing an offender to justice; and (4) termination of the proceedings in favor of the accused.  *Davis v. Giles*, 769 F.2d 813, 814-815 (D.C. Cir. 1985).  As set forth above, there was probable cause to arrest Messrs. Edwards and Egbeju, and, in fact, Mr. Edwards was convicted of misdemeanor assault.  Further, Plaintiffs have not alleged or brought forth any evidence that the D.C. Defendants engaged in excessive force or acted to discourage Plaintiffs from asserting their civil rights.  The malicious prosecution claim is groundless and will be dismissed.

F.  Tort Claims Asserted by Ms. Mungal

Ms. Mungal's tort claims against the D.C. Defendants also must be dismissed because she failed to comply with the notice requirement of D.C. Official Code § 12-309 (2001).  Section 12-309 provides:

> An action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or [his] attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.  A report in writing by the Metropolitan Police Department, in regular course of duty, is a sufficient notice

-22-

under this section.[13]

Compliance with this notice provision is a mandatory prerequisite to filing a suit against the District of Columbia. *Hill v. Dist. of Columbia*, 345 A.2d 867, 869 (D.C. 1975). Ms. Mungal never provided such notice. D.C.'s Mem. Ex. 5, Affidavit of Mia Powell Liley.

## IV. CONCLUSION

For the reasons stated, Okie Dokie's motion for summary judgment [Dkt. #17] and the D.C. Defendants' motion for summary judgment [Dkt. #16] will be granted, Plaintiffs' motion for summary judgment [Dkt. # 21, 24, 25] will be denied, and this case will be dismissed.[14] A memorializing order accompanies this Memorandum Opinion.


Date: February 6, 2007                              _____/s/_____
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge


_____

[13] A MPD report was filed regarding this incident, *see* D.C.'s Mem. Ex. 1, Statement of Probable Cause, but it did not provide sufficient notice with regard to Ms. Mungal since the report did not mention Ms. Mungal.

[14] The Amended Complaint also named as defendants the following individuals: Shirafkhan Makan (whose actual name is Makan Shirafkn, *United States v. Edwards*, M50-04 (Sup. Ct. March 15, 2004) Trial Tr. at 10), Mehdi Rofoujaran, Keith Adam Shulman, Moe Darwish, Marcelo Pepe, and several John Does as well as D.C. police officers T. Smith and Erick Alvarado. These individuals were never served. Since the allegations against these individuals are the very same allegations as those against Okie Dokie and the D.C. Defendants, this suit is dismissed against these individuals for the same reasons that it is dismissed against Okie Dokie and the D.C. Defendants.